OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 Is the criminal activity exclusion in the homeowner’s general liability insurance policy before us unenforceable as a
 
 *292
 
 matter of public policy? Unlike the Appellate Division, we conclude that the exclusion is enforceable.
 

 Ryan Slayko and Joseph France were drinking alcoholic beverages and smoking marijuana one night in the cabin where France dwelt, on premises owned by France’s grandmother. France picked up a shotgun, pointed it at Slayko and pulled the trigger, believing the gun to be unloaded. The gun did not discharge, and Slayko exclaimed “What are you doing? Never point a gun around somebody and pull the trigger.” By his own account, Slayko said this with a “smirky laugh * * * because we were fooling around.” France then pumped the gun and pulled the trigger again. This time the gun discharged, injuring Slayko. France took immediate measures to stanch Slayko’s bleeding and summon help.
 

 France subsequently pleaded guilty to the felony of assault, second degree, admitting that he recklessly caused serious physical injury by means of a deadly weapon
 
 (see
 
 Penal Law § 120.05 [4]). At about the same time, Slayko sued France for negligence. France tendered the defense to Security Mutual Insurance Company, which had issued a homeowner’s policy that covered the premises. Security Mutual promptly disclaimed coverage, denying that it had a duty to defend or indemnify France. France made no appearance in the personal injury action, and Supreme Court entered a default judgment on liability.
 

 Slayko commenced the instant action against Security Mutual and France, seeking a declaration that the insurer had the duty to defend and indemnify France. Security Mutual denied that the policy covered France and relied on the policy’s intentional act and criminal activity exclusions. The intentional act exclusion provides that the policy does not apply to liability “caused intentionally by or at the direction of any insured.” The criminal activity exclusion provides that the policy does not apply to liability “arising directly or indirectly out of instances, occurrences or allegations of criminal activity by the insured.”
 

 Supreme Court granted Slayko’s motion for summary judgment, and its threshold determination that France is an “insured” under the policy remains unchallenged. The Appellate Division affirmed, holding that the intentional act exclusion did not apply and the criminal activity exclusion, though applicable, was unenforceable as a matter of public policy
 
 *293
 
 because it “clearly defies the reasonable expectations of the insured” (285 AD2d 875, 878). We agree with the first holding but not the second. Accordingly, we reverse and grant Security Mutual’s cross motion for summary judgment.
 

 The Intentional Act Exclusion
 

 Security Mutual first argues that the intentional act exclusion applies because France’s misconduct is «so “heinous” that it must be deemed intentional as a matter of law. In thus framing the argument, the insurer concedes that there is no evidence that France actually intended to injure Slayko. The evidence shows that the two
 
 young men
 
 were Mends up until the shooting; that France was surprised when the gun discharged; and that he took prompt measures to mitigate the harm he had caused.
 

 Because France did not intend to injure Slayko, the intentional act exclusion could apply only if the injury were “inherent in the nature” of the wrongful act
 
 (see Allstate Ins. Co. v Mugavero,
 
 79 NY2d 153, 161 [1992]). Security Mutual maintains that France’s act was inherently harmful because pointing any gun is dangerous and France undisputedly intended to point the gun and pull the trigger. We have long recognized, however, that insurable “accidental results” may flow from “intentional causes”
 
 (see McGroarty v Great Am. Ins. Co.,
 
 36 NY2d 358, 364 [1975]).
 
 Mugavero
 
 identifies a narrow class of cases in which the intentional act exclusion applies regardless of the insured’s subjective intent. There, faced with an implausible argument that the insured did not intend the injuries he caused, we found wisdom in “the public perception that molesting a child without causing harm is a virtual impossibility” (79 NY2d at 161). The same cannot be said here, as the gun could have been empty.
 

 Thus, France’s conduct, though reckless, was not inherently harmful for the purpose of the intentional act exclusion. The general rule remains that “more than a causal connection between the intentional act and the resultant harm is required to prove that the harm was intended”
 
 (id.
 
 at 160). Under this standard, as the Appellate Division correctly held, the exclusion does not apply.
 

 The Criminal Activity Exclusion
 

 Unlike the intentional act exclusion, the criminal activity exclusion, on its face, does apply, as France’s liability arose directly from an act for which he stands convicted. Slayko does
 
 *294
 
 not dispute that France’s conduct falls within the broad sweep of the exclusionary language. He argues, rather, that the language is
 
 too
 
 broad. The courts below accepted this argument, conjecturing that the exclusion, if enforced, would “reduce indemnity to a mere facade” (285 AD2d at 878).
 

 In that homeowners face potential liability for many noncriminal acts of negligence, and the criminal activity exclusion leaves coverage for such liability intact, we cannot agree that indemnity would be so dramatically reduced. Further, New York courts have long known how to distinguish crimes from lesser statutory violations for the purpose of determining insurance coverage
 
 (see Messersmith v American Fid.
 
 Co., 232 NY 161, 164 [1921];
 
 see also Insurance Co. of N. Am. v Chinoise Rest. & Trading Corp.,
 
 85 AD2d 712, 713 [1981]). A case may arise in which a broad criminal activity exclusion like Security Mutual’s facially applies, yet works an injustice because the prohibited act involves little culpability or seems minor relative to the consequent forfeiture of coverage. This, however, is not such a case.
 

 We are mindful, moreover, of the background of the broad language that Slayko seeks to nullify. The criminal activity exclusion is part of a “New York Amendatory Endorsement” to the policy form Security Mutual used, an endorsement dated November 1991. That date is five months after
 
 Allstate Ins. Co. v Zuk
 
 (78 NY2d 41 [1991]), which construed a different criminal activity exclusion. The policy in
 
 Zuk
 
 excluded coverage for “bodily injury * * * which may
 
 reasonably be expected to result from the intentional or criminal acts
 
 of an insured person * * *”
 
 (id.
 
 at 44 [emphasis in original]). In
 
 Zuk,
 
 the insured fatally shot a friend while cleaning a shotgun, and pleaded guilty to second degree manslaughter. We held that the conviction did not collaterally estop the insured from disputing that the injury was “reasonably expected”
 
 (id.
 
 at 46-47). The exclusion now under review omits reference to “reasonably expected” results in the drafter’s evident attempt to find enforceable policy language that removes coverage from criminal conduct such as France’s. Absent evidence of a strong public policy requiring such coverage we are reluctant — especially on the facts before us — to send the drafters of insurance policy forms back to the drawing board.
 

 Both sides invoke public policy. For Security Mutual, the overriding policy concern is the interest law-abiding homeowners have in low premiums, an interest best served if such homeowners are not compelled to pool risk with convicted felons.
 
 *295
 
 Additionally, the insurer notes the settled principle that “no one shall be permitted to take advantage of his own wrong” (see
 
 Messersmith,
 
 232 NY at 165). Slayko counters that accident victims should as a matter of public policy have recourse to financially responsible defendants. The cases from which he culls this proposition relate, however, specifically to automobile accidents and insurance (see
 
 e.g. Planet Ins. Co. v Bright Bay Classic Vehs.,
 
 75 NY2d 394, 401 [1990]). Cases involving auto insurance coverage — an area in which the contractual relationship and many of its terms are prescribed by law — provide a weak basis for generalization about the constraints public policy places upon other insurance contracts.
 

 The “public policy of this state when the legislature acts is what the legislature says that it shall be”
 
 (Messersmith,
 
 232 NY at 163). Conversely, when statutes and Insurance Department regulations are silent, we are reluctant to inhibit freedom of contract by finding insurance policy clauses violative of public policy
 
 (see Joseph R. Loring & Assoc. v Continental Cas. Co.,
 
 56 NY2d 848, 850 [1982];
 
 Miller v Continental Ins. Co.,
 
 40 NY2d 675, 679 [1976]). When we recently found an exclusion unenforceable because it detracted from the statutorily-mandated minimum fire insurance coverage, we explicitly limited our decision to matters involving fire insurance
 
 (see Lane v Security Mut. Ins. Co.,
 
 96 NY2d 1, 6 [2001]).
 

 There is no statutory requirement for the full panoply of coverages known as homeowner’s insurance and hence “no prohibition against such insurers limiting their contractual liability”
 
 (see Suba v State Farm Fire & Cas. Co.,
 
 114 AD2d 280, 284 [1986]). To be sure, the policy France’s grandmother bought includes coverage components, such as fire insurance, that are set by statute
 
 (see
 
 Insurance Law § 3404 [e]). Indeed, there are even statutory provisions applicable to the liability coverage under which Slayko specifically seeks to recover
 
 (see
 
 Insurance Law § 3420 [a]). Slayko does not base his claim on any purported failure of the Security Mutual policy to comply with these express statutory requirements. The policy’s apparent compliance with the statute makes us all the more reluctant to fault it for failing to meet a further, implied requirement.
 

 Furthermore, the Insurance Law explicitly permits carriers of personal lines insurance — a term that includes the policy at issue here — to cancel policies if the insured is convicted “of a crime arising out of acts increasing the hazard insured against”
 
 (see
 
 Insurance Law § 3425 [c] [2] [B]). This permission is set forth in a section that generally places restrictions on insurers’
 
 *296
 
 freedom to cancel coverage. Thus, to the extent that the Legislature has expressed a public policy about coverage for persons who perform criminal acts, that policy is to facilitate rather than hinder insurers’ efforts to remove such persons and their property from the general risk pool.
 

 In this context, the heavy reliance of Slayko and amici on
 
 Royal Indem. Co. v Providence Washington Ins. Co.
 
 (92 NY2d 653 [1998]) is misplaced. In
 
 Royal Indemnity
 
 we held that a clause that excluded liability coverage for trucks driven under certain circumstances was void as against public policy and that the policy must therefore “be read as if the exclusion did not exist”
 
 (id.
 
 at 656). Slayko argues that under
 
 Royal Indemnity
 
 if a policy exclusion potentially negates any coverage required by public policy, that exclusion must be stricken entirely. Assuming for the sake of argument that this is true, it still does not show that the criminal activity exclusion here negates any coverage that public policy requires. Put simply, no statute compels coverage here as Vehicle and Traffic Law § 388 did in
 
 Royal Indemnity.
 

 The Appellate Division reasoned that the “mere fact that an act may have penal consequences does not necessarily mean that insurance coverage for civil liability arising from the same act is precluded by public policy” (285 AD2d at 878, quoting
 
 Public Serv. Mut. Ins. Co. v Goldfarb,
 
 53 NY2d 392, 399 [1981]). But while public policy does not
 
 prohibit
 
 coverage for liability arising from criminal acts, it does not follow that public policy
 
 requires
 
 such coverage. We have never made that logical leap.
 

 Finally, we decline to follow cases from other jurisdictions holding that the broad criminal activity exclusion “defies the reasonable expectations of the insured” (285 AD2d at 878, citing
 
 Tower Ins. Co., Inc. v Judge,
 
 840 F Supp 679, 692-693 [D Minn 1993]). Some states have developed the “reasonable expectations” doctrine to mitigate the rigors of policy exclusions when such exclusions operate in surprising and unfair ways
 
 (see e.g. Atwater Creamery Co. v Western Natl. Mut. Ins. Co.,
 
 366 NW2d 271 [Minn 1985]). This doctrine has its own complex jurisprudence, and we will not lightly adopt it where, as here, the effect of the exclusion is neither surprising nor unfair. In any event, most of the courts in other jurisdictions that have considered public policy challenges to exclusions worded like the one under review have found the exclusions enforceable
 
 (see e.g. Allstate Ins. Co. v Norris,
 
 795 F Supp 272, 275-276 [SD Ind 1992];
 
 Allstate Ins. Co. v Juniel,
 
 931 P2d 511, 516 [Colo Ct App 1996];
 
 Horace Mann Ins. Co.
 
 v
 
 Drury,
 
 213 Ga
 
 *297
 
 App 321, 323, 445 SE2d 272, 274-275 [1994];
 
 Princeton Ins. Co. v Chunmuang,
 
 151 NJ 80, 98, 698 A2d 9,18 [1997];
 
 New Mexico Physicians Mut. Liab. Co. v LaMure,
 
 116 NM 92, 98, 860 P2d 734, 740 [1993]).
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, plaintiffs motion for summary judgment denied, defendant-appellant’s cross motion for summary judgment granted and judgment granted declaring that defendant-appellant has no duty to defend and indemnify plaintiff in the underlying personal injury action.
 

 Judges Smith, Levine, Ciparick, Wesley, Rosenblatt and Graffeo concur.
 

 Order reversed, etc.